❏ Original     ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Records and information associated with the cellular device assigned call number (747) 724-5107, that is in the custody or control of T Mobile, a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey; and the cellular device assigned call number (747) 724-5107 | ) ) ) ) ) |

Case No. 24-949M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 1/1/2025_____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Honorable Nancy Joseph _____.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of _____ 06/16/2025 _____.

Date and time issued: 12/18/2024 @ 3:27 p.m. _____

*Judge's signature*

City and state:     Milwaukee, WI _____     Honorable Nancy Joseph, U.S Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

1.      Records and information associated with the cellular device assigned call number (747) 724-5107 (referred to herein and in Attachment B as "the **TARGET CELL PHONE**"), that is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey.

2.      The **TARGET CELL PHONE.**

1

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

I.      **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.      The following subscriber and historical information about the customers or subscribers associated with the **TARGET CELL PHONE** for the time period December 17, 2023, to the present:

    i.      Names (including subscriber names, user names, and screen names);

    ii.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.    Local and long distance telephone connection records;

    iv.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.      Length of service (including start date) and types of service utilized;

    vi.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

2

vii.     Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix.      All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **TARGET CELL PHONE** for the time period December 17, 2023, to the present including:

   a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b.   Information associated with each communication to and from (747) 724-5107 for a period of **30** days from the date of this warrant, including:

   i.    Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii.   Source and destination telephone numbers;

   iii.  Date, time, and duration of communication; and

   iv.   All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **TARGET CELL PHONE** will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

3

c. Information about the location of the **TARGET CELL PHONE** for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, RTT data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the (747) 724-5107 on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, involving **UM5107** and others known and unknown.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("Provider") and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Provider. The attached records consist of _____ (*generally describe records in terms of pages, CDs or megabytes of data*). I further state that:

      a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Provider, and they were made by Provider as a regular practice; and

      b.     such records were generated by Provider's electronic process or system that produces an accurate result, to wit:

           1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Provider in a manner to ensure that they are true duplicates of the original records; and

           2.     the process or system is regularly verified by Provider, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____      _____
Date                             Signature

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br><sub>Records and information associated with the cellular device assigned call number (747)</sub><br><sub>724-5107, that is in the custody or control of T Mobile, a wireless communications service</sub><br><sub>provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey;</sub><br><sub>and the cellular device assigned call number (747) 724-5107</sub> | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.24-949M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

see Attachment A,

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to distribute and possess with intent to distribute controlled substances; |
| 21 U.S.C. § 841(a)(1) | Distribution of controlled substances |

The application is based on these facts:

see attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of _180_ days *(give exact ending date if more than 30 days:*  06/16/2025  *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JEREMY S DORN    <sub>Digitally signed by JEREMY S DORN<br>Date: 2024.12.18 11:22:40 -06'00'</sub>

*Applicant's signature*

Jeremy Dorn, HSI/ICE Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: 12/18/2024

*Judge's signature*

City and state:  Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jeremy Dorn, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(747) 724-5107** (**TARGET CELL PHONE**).  The **TARGET CELL PHONE's** service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054, with no assigned subscriber information. The user of the **TARGET CELL PHONE** has not been identified and will be referred as "**UM5107**" (also known as "Primo") herein.[1] The **TARGET CELL PHONE** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the

---

[1] "UM" is an abbreviation for unidentified male, and "5107" represents the last four digits of the **Target Cell Phone**.

1

information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.      I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations/U.S. Immigration and Customs Enforcement (HSI/ICE), assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I am also a Task Force Officer (TFO) with the United States Department of Justice, Drug Enforcement Administration, currently assigned to DEA Group 63, at the North Central High Intensity Drug Trafficking Area (HIDTA). I have been a federal law enforcement agent for over ten years. I have received basic criminal investigative training, including thirty-six weeks at the Federal Law Enforcement Training Center (FLETC). In the course of my work, I have become knowledgeable with the enforcement of federal narcotics laws. I am currently a member of the HIDTA Task Force assigned to the opioid initiative as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances. I have participated in drug trafficking investigations conducted by HSI/ICE, the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances. As a narcotics investigator, I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone and financial records, and the arrests of numerous drug traffickers. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers. I have participated in investigations involving Title 21 offenses

2

and am familiar with the Interagency Cooperation Agreement between the DEA and HSI. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Throughout this affidavit, reference will be made to case agents or investigators. Case agents or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 841(a)(1) (distribution of controlled substances), have been committed, are being committed, or will be committed by Daniel MORALEZ (a/k/a "Dany"), Fernando PALMA-JIMENEZ (a/k/a "Negrito" "Chapo," "Chapito," "Negro," and "Patillas"), Unknown Male 5107 (**UM5107**, a/k/a "Primo") and others. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

5.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is

3

a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. The United States, including HSI and the DEA, is conducting a criminal investigation of Daniel MORALEZ (a/k/a "Dany" and "Woody"), Fernando PALMA-JIMENEZ (a/k/a "Negrito," "Chapo," "Chapito," "Negro," and "Patillas"), Erik RODRIGEUZ (a/k/a "Niñote"), **UM5107**, Julio MELENDREZ ORTEGA, Jesus LOZANO VILLARREAL, Jesus PEREZ ROMAN, and others regarding possible violations of Title 21, United States Code, Sections 846 and 841(a)(1).

7. In March 2023, HSI Milwaukee, and members of North Central High Intensity Drug Trafficking Area (HIDTA) DEA Group 63 and Group 68, initiated an investigation into drug trafficking activities of Fernando Israel PALMA-JIMENEZ. A Confidential Informant (hereinafter CI-1) notified investigators about a large drug trafficking organization affiliated with Sinaloa, Mexico Money Laundering/Drug Trafficking Organization (MLDTO) (hereinafter Sinaloa MLDTO) being operated in Milwaukee, Wisconsin. CI-1 indicated Fernando PALMA-JIMENEZ operates a body shop on the north side of Milwaukee and has been involved in drug trafficking for approximately 20 years. CI-1 stated the Milwaukee-based MLDTO receives 30-50 kilograms of narcotics, which are transported by vehicle from Arizona, on a monthly and sometimes bi-monthly basis. CI-1 stated the narcotics are concealed in after-market compartments within the "load vehicles" and driven to the body shop operated by

4

PALMA-JIMENEZ. CI-1 provided cellular telephone number (414) 326-6333, for PALMA-JIMENEZ.

**June 24, 2023, Narcotics Seizure in Milwaukee, Wisconsin**

8.      On June 24, 2023, HSI in Milwaukee received information that a white Ford F-450 bearing Illinois registration 145423C (hereinafter Subject Vehicle 1), had traveled through the interior of the United States and was located in the area of 5890 South Howell Avenue, Milwaukee, Wisconsin, which was determined to be the Hilton Garden Inn Hotel. Based upon the investigation, Subject Vehicle 1 was suspected of containing an unknown amount and type of narcotics. HSI Milwaukee special agents located Subject Vehicle 1 that same day at the parking lot of the Hilton Garden Inn at approximately 6:45 a.m. Shortly after agents located Subject Vehicle 1, a drug detection canine alerted to the presence of narcotics at the front passenger door area of Subject Vehicle 1.

9.      At approximately 12:50 p.m., HSI agents observed an individual enter Subject Vehicle 1. Agents encountered the subject, hereinafter "Cooperating Source-1" (CS-1), who stated in an audio-recorded post *Miranda* interview that Subject Vehicle 1 contained concealed narcotics. CS-1 provided agents verbal and written consent to search Subject Vehicle 1, which resulted in the seizure of approximately 25.8 kilograms of cocaine, consisting of 26 individually wrapped brick-sized objects, from a spare fuel tank in the front of the truck bed. Approximately 24 "bricks" were wrapped in brown packaging, while approximately 2 "bricks" were wrapped in aluminum packaging.

5

10.     CS-1 further stated CS-1 was instructed to meet unknown individuals in the morning of June 25, 2023.  CS-1 was instructed to leave the keys in the vehicle and two, unidentified Hispanic males would take the vehicle to an unknown location and remove the narcotics.  CS-1 was not aware of where Subject Vehicle 1 was to be taken to offload the narcotics.

11.     CS-1 provided information to law enforcement agents beginning on June 24, 2023.  The information CS-1 provided is substantially against CS-1's personal interest. The information provided by CS-1 has also been corroborated by agents through a consent search, surveillance, the seizure of physical evidence, and review of WhatsApp text conversation between CS-1 and an Arizona-based coordinator only identified as "Luis."  CS-1 does not have a prior criminal history.  CS-1 is cooperating in exchange for consideration relating to the seizure of approximately 30 kilograms of cocaine on June 24, 2023.  Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CS-1 is credible and CS-1's information reliable.

12.     In the early morning hours of June 25, 2023, law enforcement agents set up surveillance of the meet location between CS-1 and the unknown males that planned to obtain Subject Vehicle 1. That morning, CS-1 received a WhatsApp message from a co-conspirator, which message contained an image of a McDonald's location on Oklahoma Avenue in Milwaukee.

13.     On June 25, 2023, at approximately 8:20 a.m., Subject Vehicle 1 arrived at the McDonald's located at 617 W. Oklahoma Avenue in Milwaukee, Wisconsin.  At

6

approximately 8:22 a.m., a Hispanic male, later identified as Julio MELENDREZ ORTEGA entered Subject Vehicle 1 and departed the area. A silver Jeep (hereinafter Subject Vehicle 2) followed Subject Vehicle 1 to the detached garage in the alley between South 8th and South 9th Streets, located at 3033 S. 8th Street in Milwaukee, Wisconsin. Based on case agents' training and experience, case agents are aware drug traffickers and transporters often use additional vehicles to follow the narcotics-laden vehicle to provide counter-surveillance of law enforcement and/or to facilitate the movement of narcotics.

14.    A short time later, or at approximately 8:24 a.m., MELENDREZ ORTEGA backed Subject Vehicle 1 in the garage located at 3033 South 8th Street, and the garage door of this residence remained open. Subject Vehicle 2 parked in the alley in front of a garage that is next to the detached garage for the 8th Street residence. Additionally, a Chevrolet Silverado (hereinafter Subject Vehicle 3) arrived at the residence and was believed to have deliberately parked in front of Subject Vehicle 1 in the garage. At approximately 8:30 a.m., law enforcement approached the garage towards the open roll-up door of the 8th Street residence and encountered MELENDREZ ORTEGA, and three other individuals later identified as, Mario VELAZQUEZ HERNANDEZ, Jesus LOZANO VILLARREAL, and Jesus PEREZ ROMAN, who were all subsequently placed in custody.

15.    On June 25, 2023, the Honorable Stephen C. Dries, United States Magistrate Judge of the Eastern District of Wisconsin, authorized a search warrant for the residence and detached garage. S*ee* 23-M-407 (SCD). During the execution of this warrant, law

enforcement located a backpack in the detached garage that contained at least 23 bundles of U.S. currency totaling $459,600. The bundles were wrapped in brown packaging and were also marked with one to four "x"'s on the outside. Based on their training and experience, and familiarity with this investigation, case agents believe that the bulk U.S. currency located in the backpack in the detached garage constitutes drug proceeds.

16.     On June 30, 2023, the Honorable Stephen C. Dries, United States Magistrate Judge, authorized a search warrant for eight cellular phones seized from Julio MELENDREZ ORTEGA, Mario VELAZQUEZ HERNANDEZ, Jesus LOZANO VILLARREAL, and Jesus PEREZ ROMAN. *See* 23-M-415 (SCD).

17.     A subsequent review of telephonic contacts between (414) 326-6333 and the phones seized from PEREZ ROMAN revealed approximately 157 contacts between May 1, 2023, and June 25, 2023, including 106 contacts between June 24, 2023, and June 25, 2023. Additionally, since June 25, 2023, case agents have observed PALMA-JIMENEZ operating Subject Vehicle 2 on multiple occasions at PALMA-JIMENEZ's auto body shop.

18.     In July 2023, a Confidential Informant (CI-1) informed case agents that CI-1 had recently been with PALMA-JIMENEZ before the June 25, 2023, event. CI-1 said PALMA-JIMENEZ was accompanied by an individual described as being from the Sinaloa Cartel. CI-1 was shown several photographs and identified Jesus PEREZ ROMAN as the subject who accompanied PALMA-JIMENEZ. At the time, CI-1 was not aware that HSI Milwaukee was responsible for the June 25, 2023, arrest of PEREZ

8

ROMAN and the other subjects[2]. In July 2023, CI-1 informed case agents that CI-1 was with PALMA-JIMENEZ when he received a phone call from someone in Mexico who told PALMA-JIMENEZ that the subjects were arrested and instructed PALMA-JIMENEZ to go to a stash house in Milwaukee and remove a large amount of money and several kilograms of heroin. According to CI-1, PALMA-JIMENEZ retrieved several kilograms of narcotics and $100,000 in bulk cash from the stash house. CI-1 stated that PALMA-JIMENEZ was also instructed to retrieve $60,000 from Subject Vehicle 2, previously identified as being driven by Jesus PEREZ-ROMAN, which was concealed in an after-market compartment. CI-1 further stated PALMA-JIMENEZ was instructed to re-register Subject Vehicle 2 and maintain control of the vehicle, which agents have seen traveling to and from PALMA-JIMENEZ's body shop business, as noted above. According to CI-1, the individual from Mexico who called PALMA-JIMENEZ told him (PALMA-JIMENEZ) that he was to take over drug trafficking activities in Milwaukee.

19.     CI-1 has provided law enforcement agents information and statements against CI-1's penal interests for at least the past ten years. Law enforcement has corroborated much of this information through independent investigations, and CI-1 has conducted controlled buys of narcotics for law enforcement. CI-1 has no criminal

---

[2] MELENDREZ-ORTEGA, LOZANO-VILLARREAL, and PEREZ-ROMAN were subsequently charged with and pled guilty to attempted possession with intent to distribute controlled substances, namely cocaine, stemming from this incident. *See United States v. Julio Melendrez Ortega*, et al., 23-CR-133, Eastern District of Wisconsin.

convictions. CI-1 is cooperating in exchange for immigration benefits, including Deferred Action and Employment Authorization status and for monetary compensation. CI-1 has received a monetary benefit of $1,500 for participation in the ongoing investigation. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CI-1 is credible and CI-1's information reliable.

**Interview Of Source of Information – 2**

20.    Between August and October 2023, case agents interviewed Source of Information-2 (SOI-2) regarding the June 2023 narcotics shipment seized by law enforcement, among other things. SOI-2 stated SOI-2 was introduced to Jesus PEREZ-ROMAN who had been sent by the Sinaloa Cartel to oversee drug operations in Milwaukee, Wisconsin. SOI-2 stated PEREZ-ROMAN instructed SOI-2 to find kilogram-level customers for further distribution and to obtain "stash" locations used to receive and store narcotics and narcotics proceeds. SOI-2 indicated PEREZ-ROMAN would provide names of individuals in Mexico who were to receive money transfers through Western Union or "Sigue," which were derived from narcotics proceeds. SOI-2 further explained that PEREZ-ROMAN tasked SOI-2 with obtaining money orders between $30,000 - $40,000. The money orders were then used to purchase vehicles. The vehicles purchased with the money orders were then outfitted with after-market hidden compartments used to store and transport narcotics.

21.    During the June 24, 2023, event, SOI-2 was tasked with finding a location to offload the narcotics. SOI-2 explained that the narcotics were originally supposed to go

10

to an autobody garage, but PEREZ-ROMAN could not make contact with the unknown individual in charge of the autobody garage. After the arrest of the subjects on June 24, 2023, SOI-2 learned the unknown individual in charge of that aforementioned autobody garage was known as "Fernando" and "Israel" (later determined to be Fernando Israel PALMA-JIMENEZ). SOI-2 also learned that after the arrests of the subjects on June 24, 2023, PALMA-JIMENEZ was tasked with going to the residence of PEREZ-ROMAN and removing any remaining narcotics and bulk-cash currency. CI-1 reported to case agents that CI-1 was with PALMA-JIMENEZ, who received a phone call from an unknown individual in Mexico, instructing PALMA-JIMENEZ to go to the residence of PEREZ-ROMAN and remove any remaining drugs and bulk-cash. CI-1 also stated PALMA-JIMENEZ drove Subject Vehicle 2 to PEREZ-ROMAN's residence to remove any remaining drugs and bulk cash. SOI-2 also told case agents that PALMA-JIMENEZ was placed in charge of overseeing the drug operations in Milwaukee and elsewhere after PEREZ-ROMAN was arrested. According to SOI-2, a narcotics shipment arrives on a monthly basis to Milwaukee, Wisconsin, and generally the narcotics proceeds are due back in Arizona by the first week of the next month for transportation to Mexico. SOI-2 further explained that the narcotics that arrive on a monthly basis are already accounted for by multi-kilogram customers for further distribution.

22.    SOI-2 stated Daniel MORALEZ is a multi-kilogram distributor within the MLDTO and is the owner of a tow truck company in Milwaukee, WI.

23.     SOI-2 has provided information largely corroborated by independent investigation.  SOI-2 is cooperating for consideration of a reduced sentence on a felony narcotics conviction.   SOI-2 has violations of traffic statutes, and a misdemeanor conviction for operating while under the influence.   Within the context of the information detailed and relied upon for purposes of this affidavit, I believe SOI-2 is credible and SOI-2's information reliable.

**Controlled Purchase of Fentanyl from Fernando PALMA-JIMENEZ: February 2024**

24.     On February 12, 2024, CI-1 reported to case agents that CI-1 met with PALMA-JIMENEZ for dinner on February 10, 2024, at which time PALMA-JIMENEZ agreed to sell CI-1 50 grams of heroin for $2,500. CI-1 indicated PALMA-JIMENEZ arrived in Subject Vehicle 2. The transaction was planned for February 14, 2024, at PALMA-JIMENEZ's new and additional auto body shop at 3002 W. Burleigh Street, Milwaukee, Wisconsin.

25.     On February 14, 2024, CI-1, under the direction and control of case agents, placed a recorded telephone call to PALMA-JIMENEZ at the (414) 326-6333. PALMA-JIMENEZ answered the call, and CI-1 told PALMA-JIMENEZ that CI-1 has the check. PALMA-JIMENEZ responded that it was ready.

26.     CI-1 was provided with $2,500 in pre-recorded buy money and an audio/video recording device. Case agents followed CI-1 to 3002 W. Burleigh Street, Milwaukee. Case agents observed CI-1 enter the garage, exit the garage a short time later, and drive away from the area.

12

27.     After the controlled buy, CI-1 was followed to a pre-determined meet location. Upon arrival, CI-1 provided investigators with approximately 50.8 grams of a white substance, which later field tested positive for fentanyl.

28.     During a debriefing after the controlled purchase, CI-1 advised that upon arriving at the auto body shop, CI-1 called PALMA-JIMENEZ and advised that CI-1 had arrived. As CI-1 walked into the garage, PALMA-JIMENEZ told CI-1 to move CI-1's vehicle because he was expecting other people. CI-1 told PALMA-JIMENEZ that CI-1 needed to use the bathroom and was in a hurry. After exiting the bathroom, CI handed $2,500 in pre-recorded buy money to PALMA JIIMENEZ.  PALMA-JIMENEZ reached inside the front side passenger window of his red Volkswagen Jetta, Subject Vehicle 5, removed the suspected heroin, and handed it to CI-1. PALMA-JIMENEZ instructed CI-1 to sell more of the heroin. As CI-1 exited the garage, a Black and Hispanic male walked into the garage.

### Initiation of Court Authorized Title-III Wire and Electronic Interceptions over PALMA-JIMENEZ's Cellular Phone

29.     On September 11, 2024, The Honorable United States District Court Judge, J.P. Stadtmueller authorized the initial wire and electronic interceptions over (414) 326-6333 used by PALMA-JIMENEZ for a period of 30 days. *See* Application No. 24-AP-11.[3]

---

[3] The below intercepted communications occurred in Spanish and were translated by certified interpreters.

30.     On September 30, 2024, at approximately 2:16 p.m., CI-1 sent a text message in Spanish to PALMA-JIMENEZ, stating, "Call me when you can."  Case agents were aware CI-1 was attempting to establish communications with PALMA-JIMENEZ to arrange for the controlled purchase of one kilogram of cocaine.  That same day at approximately 4:17 p.m., PALMA-JIMENEZ called CI-1.  During the intercepted conversations, CI-1 asked, "…when can I come see you, because…so you can get me a notebook [kilogram of cocaine."  CI-1 continued, "The check is ready, dude."

31.     On or about October 2, 2024, CI-1, acting at the direction of case agents, met with PALMA-JIMENEZ to discuss purchasing a kilogram of cocaine.  During the meeting, PALMA-JIMENEZ provided two cellular numbers of contacts from whom CI-1 could potentially purchase cocaine: one of those numbers being MORALEZ's. CI-1 requested PALMA-JIMENEZ call both numbers on behalf of CI-1.   On or about October 6, 2024, at approximately 3:14 p.m., during an intercepted text conversation between CI-1 and PALMA-JIMENEZ, CI-1 asked in Spanish, "Negrito, did you check with Dany [Daniel MORALEZ] to see if he [MORALEZ] has the car part [code for cocaine] that I told you about?"  PALMA-JIMENEZ replied shortly after, stating, "Yes, but he [MORALEZ] didn't tell me anything."  On October 7, 2024, at approximately 2:06 p.m., CI-1, acting at the direction of investigators, sent a text message to PALMA-JIMENEZ asking, "Well, ask Dany (MORALEZ) what's up, dude, the papers are there ready and we'll…" CI-1 is telling PALMA-JIMENEZ to tell MORALEZ the money is ready to purchase cocaine from MORALEZ.

14

32. Between October 7, 2024, and October 10, 2024, CI-1 continued to exchange intercepted text messages and phone calls with PALMA-JIMENEZ to arrange the cocaine transaction involving CI-1, MORALEZ and PALMA-JIMENEZ. Pen Register data over the cell phone used by PALMA-JIMENEZ showed multiple attempted contacts with the MORALEZ beginning October 9, 2024.

33. On October 8, 2024, at approximately 3:46 p.m., PALMA-JIMENEZ called CI-1 and stated, "I talked to that guy [MORALEZ]…for the rims…well, that for twenty-three (23) dude." CI-1 responded, "You're kidding…No, well, the most they [third-party] pay [audio breaks] and I called and the most [audio breaks] [U/I] is twenty-four (24)." CI-1 continued, "Ask him and see if he can at least lower it one (1) buck dude…well ask him, so that there's a little profit [U/I] to pay twenty-four (24) dude." PALMA-JIMENEZ replied, "Well alright, well just so you know fucker."

34. On October 8, 2024, at approximately 3:53 p.m., PALMA-JIMENEZ called CI-1 and stated "Well, the lowest is, uh twenty-two (22)." CI-1 replied, "Okay," to which PALMA-JIMENEZ responded, "But that if it is going to be done, it has to be done well and quickly." CI-1 asked, "But he has it already?" PALMA-JIMENEZ replied, "Whenever you want it…we need to take the, the paper. He's not going to front it to me." CI-1 asked, "Do you think that you, you and I can both go? I mean, I'm saying that [U/I] we need to go pick it up." PALMA-JIMENEZ stated, "Well, yes dude. Well, I would go. You give me the paper [money to purchase the drugs]. I'll go and pick it up, and then I'll give it to you…But if it's going to be done, it has to be done well and quickly, fucker…if not, that

15

stuff will be gone, that is going to get broken up, and then it will be fucked up for us dude. We will be left like idiots…"

35.     PALMA-JIMENEZ explained to CI-1 that the drug transaction needed to occur soon before MORALEZ sold the kilogram in increments to other drug customers.

36.     On October 9, 2024, at approximately 6:29 p.m., PALMA-JIMENEZ received a call from phone number (414) 736-6755, MORALEZ**.**  During the intercepted conversation PALMA-JIMENEZ said, "What's up, Dany?" MORALEZ replied, "Just chilling out bro." PALMA-JIMENEZ said, "Oh, alright, that's good." MORALEZ replied, "Yes, I have here…I have the paint sample here." PALMA-JIMENEZ responded, "Well, the thing is, dude, that…these guys wanted to buy it like that right? And well, they would check it…it over there."  MORALEZ replied, "Oh, okay!"  PALMA-JIMENEZ asked, "What do you think?" MORALEZ said, "Oh, shit, the thing is that these guys don't do returns."  PALMA-JIMENEZ replied, Uh-huh."  MORALEZ said, "And, well, that's why I like to…uh…for them to check the paint [cocaine] first to see if it's the same color." PALMA-JIMENEZ replied, "Oh, let's see…well, do you think I can go by to pick it up?" MORALEZ said, "Sure!"

37.     MORALEZ explained to PALMA-JIMENEZ that a sample of the intended drugs to be sold to CI-1 had to be provided ahead of the kilogram sale because a third-party (unknown source of supply) does not accept refunds, or the return of drugs. MORALEZ and PALMA-JIMENEZ agreed to meet at a later time so MORALEZ could provide a sample of the drugs to PALMA-JIMENEZ to in turn provide to CI-1.

16

38.    On October 10, 2024, CI-1 agreed to meet with PALMA-JIMENEZ at a grocery store to pick up the sample of drugs from PALMA-JIMENEZ. After receiving the drug sample, CI-1 gave the sample to law enforcement. That same day, investigators conducted a field test of the drugs which tested positive for the properties of cocaine. At the direction of investigators, CI-1 told PALMA-JIMENEZ that the "buyers" were interested in continuing with the purchase of narcotics.

39.    On October 10, 2024, at approximately 12:32 p.m., CI-1 called PALMA-JIMENEZ.  During the intercepted conversation, CI-1 said, "The paint [sample of drugs] passed the test dude." PALMA-JIMENEZ responded, "Oh yes…alright." CI-1 said, "Uh, well, just that, like I told you, it has to be before, by eleven (11:00 a.m.), at the latest, negrito, if it can be done at ten (10:00 a.m.), even better…so you can tell this guy. And, well, there at, at your shop right?" PALMA-JIMENEZ said, "I'll let you know soon, soon." CI-1 responded, "Preferably dude. Tell him it's because now, tell him, that guy doesn't want to be looking around for a new place, dude…because I don't want to be looking around for another fucking place with the money, dude."

40.    On October 10, 2024, at approximately 3:15 p.m., CI-1 contacted (414) 326-6333 [PALMA-JIMENEZ]. The two parties greeted, and PALMA-JIMENEZ advised "No, well, already dude." CI-1 asked, "Is it done already?" PALMA-JIMENEZ advised, "Yes, tomorrow at ten-thirty (10:30 a.m.)," referring to the time the narcotics transaction would take place. PALMA-JIMENEZ confirmed that the narcotics purchase would occur at MORALEZ's shop. CI-1 asked "Well, send me the fucking address to see if... to see if…,"

at which time PALMA-JIMENZ advised, "You come here to my shop, and I'll go to his workplace, dude." CI-1 replied, "and then I…Then I will just go… I will follow you, ugh, I will wait for you there nearby." PALMA-JIMENEZ confirmed, "Whatever you want." CI-1 stated, "Yes, well, no, you tell him that we will drop by at around ten-thirty (10:30 a.m.), at the latest. PALMA-JIMENEZ then advised CI-1, "No, you will have to be here at fucking ten (10:00 a.m.)," referring to the time CI-1 would meet PALMA-JIMENEZ, at the Burleigh Street Shop, prior to their departure to MORALEZ's shop. CI-1 inquired about the location of MORALEZ's shop, and PALMA-JIMENEZ replied, "On Capitol, fucker, and fifty-something." Both parties then agreed to the specified date, time, and location.

41.     On October 11, 2024, investigators gave CI-1 $24,000 in pre-recorded money to buy a kilogram of cocaine from MORALEZ.  CI-1 was provided with both audio and video recording devices to record the drug transaction.  CI-1 drove to the Burleigh Street Shop and gave the money to PALMA-JIMENEZ.  The two then drove in tandem to meet MORALEZ at his Capital Drive Shop.  PALMA-JIMENEZ gave the money to MORALEZ. MORALEZ gave PALMA-JIMENEZ the drugs and then PALMA-JIMENEZ gave the drugs to CI-1.  After the drug transaction, investigators tested and weighed the drugs which resulted in the seizure of approximately 1.21 kilograms of cocaine.

**Authorized Title III Intercepted Cell Phone Calls With MORALEZ'S  Cellular Phone (TARGET TELEPHONE-2)**

42.     On November 13, 2024, the Honorable United States District Court Judge, J.P. Stadtmueller, Eastern District of Wisconsin, authorized the initial wire interceptions

18

over (414) 736-6755 (TARGET TELEPHONE-2) used by MORALEZ for a period of 30 days. *See* Application No. 24-AP-11.

43.     On December 13, 2024, the Honorable United States District Court Judge, J.P. Stadtmueller, Eastern District of Wisconsin, authorized the continued interception of wire communications and the initial interceptions of electronic communications over TARGET TELEPHON-2 for a period of 30 days. *See* Application No. 24-AP-11. Wire and electronic interceptions over TARGET TELEPHONE-2 will expire on or about January 10, 2025, at approximately 11:59 p.m. Intercepted conversations between MORALEZ, using TARGET TELEPHONE-2 and **UM5107**, using the **TARGET CELL PHONE**, indicate **UM5107**, is a narcotics source-of-supply and uses the **TARGET CELL PHONE** to facilitate kilogram amounts of narcotics sales and distribution.

### *Intercepted Conversations between the TARGET CELL PHONE and TARGET TELEPHONE-2.*

44.     On November 20, 2024, at approximately 6:52 p.m., TARGET TELEPHONE-2 placed a call to the **TARGET CELL PHONE**, used by **UM5107**. During the call, the parties greeted and MORALEZ asked, "Hey, I was going to say, uh…hey, uh…[stammers]…do you have the cold here now.. the cold ones." **UM5107** answered, "Uh, uh, how—how many, cuz? How many?" MORALEZ replied, "Yes, a friend of mine called, and he wants a pair, but he wants it right now, he says." **UM5107** stated, "Ooh, no, cuz. I may arrive, not tomorrow, Friday, cuz." MORALEZ asked, "On Friday?," and **UM5107** answered For sure, eh?" MORALEZ replied "Oh, fuck." **UM5107** advised MORALEZ saying, "You should have let me know, and the guy would have brought it

19

over." **UM5107** continued, "He called me a little while ago, ["Are you going to need anything over here, bro?]." **UM5107** further informed MORALEZ that he (unknown drug courier) would be returning on Friday. **UM5107** further stated, "I have them for you, cuz. I have them for you. Just let me know. Let me know when you are ready with the document (i.e., money) and everything so that.." MORALEZ advised "Yes" and further stated, "All right. No, well, I will let the guy know and see—and see what he says." **UM5107** then stated, "with a little notice, two (2) or three (3) days before; a couple days before you need them, and then we will do it for you right away." MORALEZ advised, "And that's why they're looking for it right now." **UM5107** informed MORALEZ, "Let me know, and I will have them there quickly. I'll have the kid bring it down Sunday." MORALEZ asked, "Or, or if…or if he fronts me the money, do you think I could go up there to the Winds (i.e., Chicago)?" **UM 5107** replied, "Yes." **UM5107** continued, "Yeah, he went to Minnesota, and that's what he told me. That's why I was asking you…" Both parties agreed to further discuss the possible narcotics transaction the following day with MORALEZ stating, "Yeah, yes, tomorrow will be fine. I'll tell him that it can still happen."

45.     Based on your affiant's training, experience, and knowledge of the investigation, MORALEZ was inquiring about purchasing two (2) kilograms of narcotics for an unknown third party. **UM5107** informed MORALEZ that the narcotics courier had already by passed the Milwaukee area, enroute to Minnesota, as MORALEZ had not communicated with **UM5107** regarding the purchasing of the narcotics. **UM5107** informed MORALEZ that he could possibly obtain narcotics in the coming days and

20

reminded MORALEZ to give a two (2) or three (3) day notice next time to guarantee the availability of the narcotics.

46.     On December 5, 2024, at approximately 7:32 p.m., TARGET TELEPHONE-2 received a call from the **TARGET CELL PHONE**, used by **UM5107**. During the call, the parties greeted and **UM5107** asked," That's all. Of which one, buddy? Of which one?" MORALEZ responded, "Well, buddy, right now I would say whatever there is, buddy." **UM5107** stated "Yes," and MORALEZ continued stating, "Uh-huh. Uh…there isn't—there isn't any of that material for..uh, the windows. But, well, uh, the other kind, buddy? What number is it at right now?" **UM5107** answered, "Honestly, it's at seventeen and a half (17.5), buddy." MORALEZ responded, Yeah? Okay, okay." **UM5107** confirmed the price by stating, "Yes that's right." MORALEZ then responded, "But let me tell him and see if we can go another five hundred (500) or so. We'll see if he is willing, buddy." **UM5107** told MORALEZ to let him (**UM5107**) know and **UM5107** would, "come by in a flash." MORALEZ then asked, "Yeah. Yeah, and—and if he' s willing tomorrow, will you come by then?" **UM5107** answered, "Tomorrow? [Sighs] Give me until the day after tomorrow. The, the… [Mumbles to self]… what's tomorrow?" MORLAEZ advised, "Yes, tomorrow is already Friday, buddy." **UM5107** stated, 'That's the problem, buddy." MORALEZ stated, "Yes, it's needed by tomorrow." **UM5107** advised MORALEZ, "Well, let me know." MORALEZ stated, "let me confirm if for you right now, and it's a yes, so it can be done."

21

47.     Based on your affiant's training, experience, and knowledge of the investigation, **UM5107** contacted MORALEZ about the status of the sale of narcotics to MORALEZ, for the unknown third party. **UM5107** advised MORALEZ that the price for a kilogram quantity of cocaine was currently $17,500. MORALEZ advised **UM5107** that he (MORALEZ) would contact the third party to see if the third party was willing to pay the $17,500 in exchange for the kilogram of cocaine. Furthermore, based upon my training, experience and familiarity with the investigation, I know that this price is consistent with the price for a kilogram of cocaine in the Eastern District of Wisconsin. Additionally, I know that the price range of a kilogram of cocaine is $16,500-$24,000.

48.     On December 9, 2024, at approximately 1:47 p.m., TARGET TELEPHONE-2 received a call from the **TARGET CELL PHONE**, used by **UM5107**. During the call, the parties greeted and **UM5107** asked, "Hey, your friend wasn't interested after all?" [Referring to the previously discussed narcotics transaction involving the unknown third party]. MORALEZ asked, "Oh, with the windows?" **UM5107** informed MORALEZ, "No, with the other one!" MORALEZ then advised, "Oh..no, to be honest, a guy showed up here selling them for sixteen (i.e., $16,000) buddy." **UM5107** replied, "For sixteen (16)?! Oh, fuck." MORALEZ then explained, "Yeah. Yeah, yes, just one seasonal, that's all." MORALEZ then advised **UM5107**, "Well, yeah, I'm saying, if something comes up, I'll let you know right away." **UM5107** asked, "Okay, then, buddy. And what's the word on the other ones? Nothing?" MORALEZ responded, "Yes. Well, uh…well, when I needed it, you didn't tell me anything else after that." **UM5107** advised, "Yeah. The thing is, I was

22

calling the guy, and he never answered. He took about two (2) days, and then after that, I said ["No, well, there's no reason to call the buddy anymore."]" MORALEZ advised **UM5107**, Yeah. No, well, also…I need that too." **UM5107** responded, "Let me know. Let me know ahead of time. Let me know about two (2) or three (3) days beforehand, and I'll have them ready for you.

49.    Based on your affiant's training, experience, and knowledge of the investigation, **UM5107** was again inquiring about the sale of cocaine to MORALEZ, for the unknown third party. MORALEZ advised that the third party was able to obtain the kilogram quantity of cocaine for $16,000, however, that was a one-time price. MORALEZ and **UM5107** then discussed a different illicit substance, with **UM5107** advising MORALEZ to provide a two- or three-days' notice, so **UM5107** would have enough time to obtain the illicit substance for sale to MORALEZ.

50.    On December 17, 2024, at approximately 10:45 a.m., TARGET TELEPHONE-2, used by MORALEZ, received a call from the **TARGET CELL PHONE**, used by **UM5107**. During the intercepted call, MORALEZ said, "Hey, cuz, what's up." **UM5107** replied, "Cuz, good morning, how are you?" MORALEZ said, "Only here, at work." **UM5107** said, "What else is there to do, cuz. Hey bro, eh, eh, by any chance, is that I'm here near by you." MORALEZ replied, "Uh huh." **UM5107** asked, "Well, I wanted to ask, do you know a guy from Zacatecas, his name is George?" MORALEZ asked, "George?" [audio breaks] MORALEZ asked again, "Um, George Medina?" **UM5107** replied, "Yes, Medina, something like that. He's from there, from the Portillo, I

23

think." MORALEZ clarified, "Portillo? Portillos." **UM5107** replied, "Portillos, Portillo. I don't know. Portillos." MORALEZ said, "Yes, my, um, I don't know him but my girlfriend says she does." **UM5107** said, "Yes. And do you know if he's around? The other day, he owes me some little money and a document. And, I, I don't know what to do. He turned off the phone, and I don't know anything about him." MORALEZ responded, "Uh. Oh, okay. Ummm, well, yeah. I kind of know who he is." **UM5107** asked, "[STAMMERS] Where I can find him to go and ask him to see what's up?" MORALEZ replied, "Ummm. Fucking shit, cuz . [ASIDE: Look, do you know where he lives] [BACKGROUND: ANDREA: I don't know where he lives but.] I can find out for you, cuz , because I don't, I don't know the guy, but, but I can find out more less and tell you where he lives." **UM5107** said, "That's great, man. I need to see what's up with him, because, well, he turned his phone off and we have a pending document, and, to be honest." MORALEZ, replied, "Ah." **UM5107** continued, "I'm still looking from him. But, I don't want to go to the dealer, I think from his brother in law, something like that, they told me he's his brother in law, that guy." MORALEZ replied, "Uh-huh." **UM5107** said, "No, no, I don't want to go ask there, so, so I would like to go where he lives." [Voices overlap] MORALEZ stated, "Yeah." **UM5107** said, "...lives, go ask him and see what's going to happen." [Voices overlap] MORALEZ stated, "Yes, yes because the dealer, I do know where the dealer is at." **UM5107** replied, "Yes, the dealer, I think so. They sent me the location of where the dealer is at." MORALEZ explained, "Yes, at Thirteen (13th)... at Thirteen (13th) and Oklahoma, nearby." **UM5107** replied, "Oklahoma, yeah, right.

What was I going to say? Eh. Here we are, cuz . Can you give a hand.. Can you give me a hand from today to the weekend, to see if something pops out." MORALEZ replied, "Yeah, fucking shit, cuz." **UM5107** said, "I am going to give it to you for cheap, cuz , for real. I am going to give it to you at Sixteen and a half (16 1/2) for you, so that you can make some money." MORALEZ replied, "Mh-hm." **UM5107** said, "Sixteen and a half (16 1/2), to come back, if you can give me a hand, at least with one." MORALEZ affirmed, "Yes." **UM5107** said, "I have a hand, but, the truth." [Voices overlap] MORALEZ said, "Fucking shit, cuz . Look, I have the shop, and everything, so, I can... I can sell it for you, but you will have to 'machetearlo' [chop it off], uh, in pieces." **UM5107** said, "Oh, I see. Yes." [Voices overlap] MORALEZ said, "Uh-huh, if you give it to me like that, I can get it out. **UM5107** replied, "Yes, but, if you get it as a whole, well yeah, cuz . But, you see that I am not [STAMMERS] coming back, and then I'm leaving Monday to my town, over there in Jalisco and I come back until the sixteen of January, after my birthday, I come back like the twenty-one (21) or twenty-two (22) of January." MORALEZ said, "Oh, Uh. If you want to leave it by the time you come back I will have your money, cuz." **UM5107** replied, "No but, that's the problem." [Voices overlap] MORALEZ said, "You need money then." **UM5107** explained, "Eh, no. The thing is that the guy from the 'terreno' [LAND] needs the document." [Voices overlap] MORALEZ replied, "Uh-huh." **UM5107** replied, "…going down, well. He's let me borrow." [Voices overlap] MORALEZ replied, "Yeah." **UM5107** clarified, "…but I have to come back with the document." [Voices overlap] MORALEZ replied, "Yes." **UM5107** said, "He's from there, from.. from

Culiacan, the one that has me on 'jaque' [UNDER PREASSURE OR THREAT], no shit." MORALEZ said, "Yeah." **UM5107** said, "If it was up to me, there's no problem, [U/I] line. I'll leave it to you, so that you can work it." MORALEZ replied, "Yeah. The truth is, yeah, that if I bought it, yes, but right now, I just bought a mechanic shop of a Million ($1,000,000) dollars." **UM5107** responded, "That's fucking good." MORALEZ replied, "I was left.. I'm not investing, then. I'm not investing on phones, then. Only, on what I have." [Voices overlap] **UM5107** said, "Yes, yes, yes." MORALEZ replied, "The way that ... The way that it is coming out.." [Unintelligible response from **UM5107**] MORALEZ said, "Uh-hu. But, yeah, I'm not investing. I'm not investing so much." **UM5107** replied, "Oh, I see." MORALEZ continued, "That is the problem. But if I get them out, I'll get it out." **UM5107** said, "No, well, no." [Voices overlap] MORALEZ said, "And I would like…" **UM5107** said, "Let's get it out, cuz, let's get it." MORALEZ replied, "And I would like.. And I would like that you come and visit me, so that you can see my shop, right. So that you can see that I am not any 'monkey'." **UM5107** responded, "Any- Any of these days, cuz, go pick me up, and we can have and grab a taco, so that we can get to know each other well." MORALEZ answered, "Uh-hm." **UM5107** said, "And then, like, I stay at hotels and all that, be paying and-at a hotel and all, cuz , I don't like it." MORALEZ stated, "Hm, it's fucked up." **UM5107** said, "That's why, only what I am going for." [MORALEZ coughed] **UM5107** continued, "Almost, all the time I go with the order, then. They call me, and I go with the order, like 'hey, come and bring two (2) or come with three (3)'. That way I can get together like six (6) or seven (7) and then I go. But then, you

26

see, this fucker 'el rey', cuz , that guy sometimes has me under pressure and says, cuz ,

'man, bring one 'hand' and here I already have a client and I am going to move it, one guy

needs two (2), one guy needs (3)…"  MORALEZ replied, "Uh-hm."  **UM5107** said, "Then

I get there, man, 'No, the guy that needed three (3) does not answer', and this and that.

No well, then you have me three or four days, its travel expenses, and it's everything, you

understand me, cuz ?"  MORALEZ affirmed, "Yeah."  **UM5107** explained, "It's be paying,

and paying to be there, while it moves. That's why that day, there was nothing. I think

the day that you needed it, the car…"  MORALEZ replied, "Uh-hm."  **UM5107** continued,

"They called me early, and said 'Hey, we are going to need it, the Centauro called me',

the boss, that guy, and called me 'hey, I'm going to need one' and that's when he came

and saw it and I saw how much they gave it to you and I said 'fucking abusers', fucking

shit. Later, they were bargaining to me, cuz."  MORALEZ said, "Yeah."  **UM5107** said,

"They were lowering it to me fucking bad."  MORALEZ said, "Yeah, no."  **UM5107**

related, "And then they raised it to you, cuz."  MORALEZ replied, "No, yeah [laughs]

they gave me a beat up."  **UM5107** said, "Yes, but…but it was good quality shit, cuz."

[Voices overlap] MORALEZ said, "Yeah, it was…"  **UM5107** responded, "For real."

MORALEZ affirmed, "Yes, that's right."  **UM5107** said, "That's why I'm telling you, cuz,

I have it, I have it. If you can give me a hand, if you can make some calls or something,

so that you can get one from me at least. [LAUGHS]."  MORALEZ replied, "Right.  Hmm,

cuz."  [Audio breaks] **UM5107** said, "If you stop later. I'm stuck here waiting to see what

goes out."  MORALEZ said, "Well, let me see what I can do. Let me see what is there to

do." **UM5107** replied, "Yes, cuz. If you have a chance in the afternoon, tomorrow, the day after tomorrow or Saturday, or whenever you can. I have to go back Monday, cuz, because Monday..." MORALEZ stated, "Okay…" **UM5107** said, "At night, I have the…the trip over there to Jalisco, I take off to Jalisco." MORALEZ and **UM5107** continued discussing when **UM5107** is flying to Jalisco, Mexico, among other things.

51. Based on your affiant's training, experience, and knowledge of the investigation, **UM5107** and MORALEZ discussed, among other things, MORALEZ purchasing a kilogram of drugs from **UM5107** for a price of $16,500 [**UM5107** – "I'm going to give it (kilogram) for cheap, cuz, for real. I'm going to give it to you at sixteen and a half (16 ½) for you, so that you can make some money."]. MORALEZ explained that he [MORALEZ] could sell the kilogram while **UM5107** is in Jalisco, Mexico, and give **UM5107** the drug proceeds when **UM5107** returns from Mexico [MORALEZ – "Oh, uh, if you want to leave it (give MORALEZ the kilogram) by the time you come back (from Mexico) I will have your money, cuz."].

## CONCLUSION

52. The location data associated with target will assist with identifying the user of the **TARGET CELL PHONE**. The location data associated with the **TARGET CELL PHONE** will continue to assist case agents in conducting targeted physical surveillance and further identify the locations and individuals associated with and the nature and scope of **UM5107** drug trafficking activities, which are believed to be associated with the Sinaloa MLDTO.

28

53. Case agents searched law enforcement databases to confirm that **TARGET CELL PHONE** is currently being serviced by T-Mobile.

54. Case agents are requesting this warrant authorizing the collection of data related to the **TARGET CELL PHONE** for 30 days to further investigate **UM5107's** activities, and to continue to identify locations to **UM5107** traveling to further his drug distribution trafficking activities.

55. Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that **UM5107** is engaged in the trafficking and distribution of controlled substances and is using the **TARGET CELL PHONE** while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of the **TARGET CELL PHONE** will continue to assist case agents in determining **UM5107's** criminal activities, to include meeting locations, co-conspirators, and potential sources of supply in Mexico.

56. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to

29

which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

57.     Based on my training and experience, I know that some service providers can collect timing advance or engineering data commonly referred to as per call measurement data (PCMD), RTT, True Call, Advance Timing, WebMap, or equivalent. Per-call measurement data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.

58.     Based on my training and experience, I know that T-Mobile can also provide historical precision GPS location information, also known as Network Event Location System (NELOS) data. NELOS data may provide location data based upon the handset itself.

**Cell-Site Data**

59.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **TARGET CELL PHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**E-911 Phase II / GPS Location Data**

60.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers)

31

to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **TARGET CELL PHONE**, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on the Service Provider's network or with such other reference points as may be reasonably available.

### Subscriber Information

61.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET CELL**

32

**PHONE's** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

62.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

63.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

64.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

65.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until **180 days** after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of

the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the (747) 724-5107 would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

66.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

# ATTACHMENT A

## Property to Be Searched

1.    Records and information associated with the cellular device assigned call number (747) 724-5107 (referred to herein and in Attachment B as "the **TARGET CELL PHONE**"), that is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey.

2.    The **TARGET CELL PHONE.**

**Particular Things to be Seized**

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.      The following subscriber and historical information about the customers or subscribers associated with the **TARGET CELL PHONE** for the time period December 17, 2023, to the present:

     i.      Names (including subscriber names, user names, and screen names);

     ii.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

     iii.      Local and long distance telephone connection records;

     iv.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

     v.      Length of service (including start date) and types of service utilized;

     vi.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

2

vii.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.      Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix.      All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **TARGET CELL PHONE** for the time period December 17, 2023, to the present including:

a.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b.   information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b.      Information associated with each communication to and from (747) 724-5107 for a period of **30** days from the date of this warrant, including:

i.      Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii.      Source and destination telephone numbers;

iii.      Date, time, and duration of communication; and

iv.      All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **TARGET CELL PHONE** will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

c.  Information about the location of the **TARGET CELL PHONE** for a period of 30 days during all times of day and night.  "Information about the location of the Subject Phone" includes all available E-911 Phase II data, RTT data, GPS data, latitude-longitude data, and other precise location information.

   i.  To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government.  In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the (747) 724-5107 on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   ii.  This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

## II.  Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, involving **UM5107** and others known and unknown.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4